## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 28 2018, 7:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Janette E. Surrisi
Wyland, Humphrey & Clevenger, LLP
Plymouth, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

C.T.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner*

March 28, 2018

Court of Appeals Case No.
50A03-1711-JV-2794

Appeal from the Marshall Circuit Court

The Honorable Curtis D. Palmer, Judge

Trial Court Cause No.
50C01-1612-JD-52

**Baker, Judge.**

[1] C.T. appeals the amended dispositional order making him a ward of the Department of Correction (DOC). Among other things, C.T. raises the following arguments on appeal: (1) the original dispositional order is void because of the circumstances surrounding the finding of delinquency; (2) the amended dispositional order is erroneous because he was not afforded due process with respect to the change of placement from a residential facility to the DOC; and (3) the trial court erred by making him a ward of the DOC. Finding no error, we affirm.

## Facts

[2] On December 12, 2016, the State filed a petition alleging that then-thirteen-year-old C.T. had committed acts that would have been child molesting, intimidation, domestic battery, and criminal mischief, had they been committed by an adult; the State later added another allegation of domestic battery and an allegation of battery.

[3] At a March 20, 2017, hearing, C.T. admitted to two counts of domestic battery and one count of battery in exchange for the dismissal of the remaining charges. The parties also agreed that C.T. would be placed in the sexually maladaptive behavior program at White's Residential Treatment Center. A judge pro tempore presided over that hearing. After making all required advisements and establishing a factual basis for the admitted allegations, the judge pro tempore found "that a sufficient factual basis exists for the juvenile delinquency" and indicated that he would enter an order to that effect. Mar. 20 Hrg. Tr. p. 9.

The same day, the presiding judge—who did not preside over the hearing—entered an order finding C.T. "to be a delinquent juvenile." Appellant's App. Vol. II p. 114-17.

[4] At C.T.'s first delinquency review hearing on June 19, 2017, the residential facility reported that C.T. was exhibiting significant behavioral problems. He had committed a "Major Offense" of "Extreme Disrespect," a "Major Offense" of "Defiant Behavior," and a "Maximum Offense" of assault on a peer. *Id.* at 133.

[5] At C.T.'s second review hearing on September 25, 2017, the residential facility reported that C.T. had accumulated "14 major offenses and 2 maximum offenses" since starting the program. *Id.* at 186. According to the report, C.T.'s behavior was worsening. For example, C.T. was observed exchanging sexually explicit notes with a female peer and attempting to touch a male peer in a sexual manner. The facility stated that if C.T. could not learn to regulate his behavior, treatment there would not be effective, warning that his placement there would end if his behavior did not improve.

[6] On October 20, 2017, the probation department notified the juvenile court that C.T. would have to leave White's within thirty days because of continuing behavioral issues, and the juvenile court held a review hearing on the issue on October 30. At that hearing, the probation department informed the juvenile court that C.T. was left with two placement options: the DOC, which has a "highly successful sex offender program" at the Pendleton Juvenile Facility, or

the Maples Unit at Oaklawn, which is a treatment facility similar to White's. The probation department believed that the Oaklawn residential program would not meet C.T.'s needs because it is so similar to the program at White's that he had just failed. C.T.'s mother testified that she did not believe the DOC would be a good environment for C.T. and asked that he be placed in Oaklawn; C.T. made the same request. Ultimately, the juvenile court agreed with probation that the DOC would be the most appropriate placement:

> . . . In life, to get somewhere you get to where you earn your place, and you have not done anything to earn anything at this point. Pretty much everything I have heard from White[']s about you has been negative. You come in today and say, well in the past few days, or in the past few weeks, I've tried to do better; it's too little too late. . . .

> So, I'm gonna send you to the Pendleton program because I think the disciplinary structure there is a little firmer than what was available at White[']s. And I think White[']s to Oaklawn is kind of a parallel move from one, essentially . . . less structured environment, to another less structured environment. . . . So, you'll have your chance to earn your way either home or to a less restrictive placement, by how you do at the Pendleton program.

Oct. 30 Hrg. Tr. p. 9-11. The amended dispositional order entered following this hearing states as follows: "Pursuant to (IC 31-37-19-6) (31-37-19-9) [sic], the Court now awards wardship of the child to the [DOC] for housing in any correctional facility for children." Appellant's App. Vol. II p. 18. C.T. now appeals.

# Discussion and Decision

## I. Dispositional Orders

C.T. first takes aim at the dispositional orders. First, he argues that the initial dispositional order is void because of the circumstances surrounding the delinquency finding. Second, he argues that the amended dispositional order is invalid because he was not afforded due process with respect to the change of placement.

When a person under the age of eighteen commits an act that would be a criminal offense if committed by an adult, the person may be adjudicated a delinquent child. Ind. Code §§ 31-37-1-1, -2. After making a delinquency finding, the juvenile court enters a dispositional decree providing for the placement of the child and other sanctions or treatment, all of which is intended to promote rehabilitation. *J.D. v. State*, 853 N.E.2d 945, 947 (Ind. 2006).

## A. Initial Delinquency Finding

C.T. contends that the juvenile court's initial finding of delinquency is void because the presiding judge, who did not preside over the actual hearing, entered the order finding delinquency. Initially, we note that this claim of error should have been raised long ago. C.T. did not object when the judge pro tempore made an oral finding of delinquency, nor did he object when the presiding judge entered the initial dispositional order. As such, he has waived this issue.

[10] C.T. responds that he is entitled to raise this argument at this late date because in his opinion, the initial dispositional order is void *ab initio*. A void judgment can be attacked at any time, even collaterally. *J.C. v. J.B.*, 991 N.E.2d 110, 115 (Ind. 2013) (drawing contrast between void judgments and voidable judgments, which will stand unless attacked on direct appeal).

[11] We will briefly address C.T.'s argument. At the hearing leading up to the initial dispositional order, C.T. admitted to committing three delinquent acts and to being a delinquent child. At the end of that hearing, the judge pro tempore orally found C.T. to be a delinquent child. And later that same day, the presiding judge entered a dispositional order finding, in writing, that C.T. is a delinquent child.

[12] C.T. directs our attention to well-established caselaw that the judge who hears evidence at an evidentiary hearing should be the same judge who enters the final judgment:

> A party is entitled to a determination of the issues by the judge who heard the evidence, and, where a case is tried to a judge who resigns before determining the issues, a successor judge cannot decide the issues or enter findings without a trial *de novo.* When a successor judge who did not hear the evidence or observe the witnesses' demeanor attempts to weigh evidence and make credibility determinations, the judge "is depriving a party of an essential element of the trial process."

*In re I.P.*, 5 N.E.3d 750, 752 (Ind. 2014) (quoting *In re D.P.*, 994 N.E.2d 1228, 1232 (Ind. Ct. App. 2013)) (internal citations omitted). Here, however, there

was no evidence to weigh; there was no witness demeanor to evaluate; and there were no credibility determinations to make. C.T. *admitted* that he was delinquent, the judge pro tempore agreed, and the presiding judge memorialized the admission and the findings in writing.

[13] C.T.'s quarrels with this process elevate form over substance to an untenable degree. It is readily apparent that every step of this process confirmed the finding of delinquency, and we find that the initial dispositional order is neither void nor voidable. We decline to reverse on this basis.[1]

# B. Due Process

[14] C.T. next directs our attention to the hearing at which the juvenile court modified his placement to be the DOC. He argues that the trial court failed to follow the steps dictated by the Indiana Code when modifying the dispositional order, thereby violating his due process rights.

[15] At the September 25, 2017, delinquency review hearing, it was acknowledged that C.T.'s placement with White's was in peril because of his behavior. At the conclusion of the hearing, the trial court scheduled the next review hearing in approximately six months, but stated that it was likely that the case would need

---

[1] We likewise decline to reverse merely because the amended dispositional order, which made C.T. a ward of the DOC, inadvertently omits the delinquency finding.

to be called in for a review hearing much earlier than that, possibly within the next thirty days, if C.T.'s behavior did not improve.

[16]     Indeed, on October 20, 2017, the probation department filed with the juvenile court a notice it had received that White's was terminating C.T.'s placement there and giving the parties and the court thirty days to relocate him. Appellant's App. Vol. II p. 192. On October 25, 2017, the probation department filed a motion for a review hearing; the juvenile court granted the motion and held the hearing on October 30. At that hearing, the probation department recommended that C.T. be made a ward of the DOC for placement and evaluation.

[17]     C.T. is correct that there are certain procedures mandated by statute. Before a periodic review hearing, the probation department is required to prepare a report on the progress made in implementing the dispositional decree. Ind. Code § 31-37-21-1(a). Also, if modification of the dispositional decree is requested, the probation department is required to prepare a modification report. *Id.* at -1(c); *see also* I.C. § 31-37-22-4 (stating that the report shall be prepared "if the state or any person other than the child or the child's parent, guardian, guardian ad litem, or custodian is requesting the modification").

[18]     Here, while the October 30 hearing was styled as a review hearing, in reality, it was an emergency hearing regarding C.T.'s placement. The probation department had filed with the juvenile court a notice from White's that it would be terminating C.T.'s placement there in thirty days. Therefore, the juvenile

court and all parties were aware of the content and purpose of the hearing. Because of the compressed timeline and the urgency of the problem that needed to be solved, the parties did not have the luxury of taking the time to prepare and file reports and recommendations. Instead, everyone did the best they could by holding a hearing, at which C.T. and his mother were present and afforded the opportunity to speak and advocate for their preferred outcome; the probation department was likewise able to present the juvenile court with options and recommendations. In our view, this process protected the rights of C.T. even as it dealt with the reality of a need to move quickly. We decline to reverse on this issue.[2]

## II. DOC Placement

Next, C.T. argues that the juvenile court's decision to place him in the DOC was erroneous. A juvenile court is afforded wide latitude and great flexibility in its dealings with juveniles. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). The specific disposition of a delinquent child is within the sound discretion of the juvenile court, and we will reverse only if the order is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.*

---

[2] C.T. also argues that he received the ineffective assistance of counsel because counsel failed to appear at two review hearings and failed to make an argument at the hearing at which C.T.'s placement was modified to the DOC. Without deciding that, in fact, juveniles in delinquency proceedings are entitled to application of the same assistance of counsel standards as those applied in adult criminal cases, we note that we find no likelihood that if counsel had behaved differently, there would have been a different result. Either way, C.T.'s behavior at White's left the juvenile court with two options: one that was similar to the placement C.T. had already failed, and the DOC. Therefore, regardless of the vigorousness of counsel's argument to the court, the result—placement in the DOC—would have been the same.

at 28. The court's discretion is subject to the statutory considerations of the child, the safety of the community, and the policy of favoring the least harsh disposition. *Id.*

[20] C.T. directs our attention to evidence in the record that service providers, the probation officer, C.T. and his mother, and the juvenile court all had concerns about C.T. being placed in the DOC. And we certainly acknowledge those concerns, as did the juvenile court. But there was also evidence in the record that C.T. failed to change his behavior during his placement at White's, despite multiple chances and months to do so. His behavior at that facility was so problematic that it limited the facility's ability to provide him with effective treatment. At the hearing, the juvenile court was presented with two options for C.T. after White's asked him to leave: either the DOC, which has a highly effective sex offender program for juveniles, or Oaklawn, which offers a program that is substantially similar to the one that he failed at White's. Under these circumstances, we cannot say that the trial court erred by finding that, even given its concerns about placing C.T. in the DOC, that program offered the best option for C.T.'s future rehabilitation.[3]

---

[3] We also disagree with C.T.'s contention that the juvenile court was more focused on punishment than rehabilitation. The court's comments about having to earn one's place in life were directed to C.T.'s behavior at White's, explaining that because he had behaved so poorly in that facility, he had not shown an ability to behave appropriately at the similar Oaklawn facility. We do not find these comments to be problematic.

[21] C.T. also finds fault with the portion of the juvenile court's order that provides as follows: "Pursuant to (IC 31-37-19-6) (31-37-19-9) [sic], the Court now awards wardship of the child to the [DOC] for housing in any correctional facility for children." Appellant's App. Vol. II p. 18. C.T. correctly notes that Indiana Code section 31-37-19-9, which applies to juveniles who have been found delinquent for acts that would be murder, kidnapping, rape, criminal deviate conduct, or certain types of robbery, does not apply to this case. It is apparent, however, that the order is merely a form order with multiple options and there was an inadvertent failure to cross out the inapplicable statute.[4] C.T.'s wardship was imposed pursuant to Indiana Code section 31-37-19-6, which provides that if a child is a delinquent child, the juvenile court may, among other things, award wardship to the DOC for housing in a correctional facility for children. I.C. § 31-37-19-6(b)(2)(A). We find no error with respect to the inadvertent inclusion of the wrong statute (in addition to the right one) in the order.

[22] C.T. also argues that the order is erroneous because it does not include a time limit on his wardship with the DOC. In support of this argument, he directs our attention to the next portion of that same statute, which provides that if a child is less than seventeen years old, the juvenile court may order "confinement in a juvenile detention facility" for not more than the lesser of

---

[4] Indeed, the very next line of the order, which is also not marked out, relates to juvenile delinquents who are female. Appellant's App. Vol. II p. 18.

(1) ninety days, or (2) the maximum term of imprisonment that could have been imposed if the child had been convicted as an adult offender for the act that the child committed. I.C. § 31-37-19-6(b)(2)(B). That statute does not apply here, however, because C.T. is not confined in a juvenile detention facility. Instead, he has been made a ward of the DOC and placed in a correctional facility for children. Consequently, we decline to reverse on this basis.

[23] The judgment of the juvenile court is affirmed.

Kirsch, J., and Bradford, J., concur.